Good morning, your honors. May it please the court. My name is Ray Shepard. I'm here on behalf of my client, Brooke Somers. In the appellee's brief, Officer Devine tells us that he arrested my client because of the volume of her speech. And the, that's on page 21. Doesn't he testify that he arrested your client because he ordered her to leave and she wouldn't? Yes, but in the brief on appeal, he argues that he arrested her because of the volume of her speech. That's on page 21 of the appellee's brief. The district court, of course, dismissed these counts on the basis of qualified immunity. So we have to look to see what was well-established law at the time that the officer made the arrest based on the facts that were presented to him. And we'll get into the alternate testimony as well. But let's go with what he's arguing on appeal, is that he arrested Ms. Somers because the volume of her speech was too loud. That implicates the state Supreme Court's case in Eanes, which held that if you, and there's a number of decisions where the Supreme Court, both of the federal Supreme Court and also the Supreme Court of Maryland, used to be the appeals, has dealt with the overlap between the First Amendment and state criminal laws. So you're talking about the First Amendment here? Yes. We're having, this situation is replicating itself across the country where people are attempting to disrupt school board meetings. And the question, I think that the people who, there are people who wish to bring legitimate interests and raise legitimate protests to what school boards are doing. And their parents are obviously very sensitive about what their children are reading and about mask policies and everything. So school boards are really in a tough kind of situation. But the folks who are protesting also have points that they want to make. And so the question I find, one of the questions I ask myself is, are the police officers who are charged with drawing the line between protecting expression and also keeping order, was there any expression that, it seemed to me that the officers actions were content neutral, as opposed with regard to the individual here. I don't see in the record what would concern me the most, which is that the officer was taking action based on disapproval of the protesters message. And I did not see in the record that he made any statements that were other than content neutral, which is you've got to quiet down with the meetings going on, or whatever. It didn't indicate that he agreed or disagreed one way or another about the mask policy or, or whatever. But wasn't this a content neutral action on the part of the officer? Well, I'm going to answer in two respects, Your Honor. First, the court's question presumes that my client was a protester. Was what? A protester. She was there. She, 40 minutes went by where she's sitting outside. She was not disrupting. I mean, there's no evidence other than the officer's testimony that there was a disruption. So let's assume that there was. You say that, but there was evidence that the school board members were looking back or looking toward the door. That's a disputed, those are disputed facts, Your Honor. Of course, any incident is always disputed, but I mean, that, I'm talking for purposes of qualified immunity. Let me get directly to your question. I just don't see that the officer headed in for the protester's point of view. I would respectfully disagree, Your Honor. The facts are my client's sitting outside, having a conversation with other people. The officer leaves the room, and this is, don't take my word for it, there's video evidence. This is all recorded. He leaves the meeting room and says to the group, keep it down. My client responds in a normal tone and voice and says, no. The officer, immediately upon hearing the word no, points to the door, starts walking towards my client and says, get out, leave now or you're going to be arrested. Okay. So, thank you. You just brought up what I think is the critical part of what I'll call part one of this instance.  When an officer directs you to leave or to do something and you say no, well, why isn't that, why isn't he entitled to direct you to leave at that point? Because the Supreme Court has made it extremely clear that a citizen has the right to protest peacefully an officer's instruction, even a lawful instruction. They have a right, well, sorry, they have a right. They absolutely don't have to agree. One hundred percent. You don't have to say you agree with everything a police officer says. You don't have to agree. You can protest it, but you can protest it. But what you can't do is when faced with a content neutral statement, I need you to keep it down. Right. The statement was not, you know, stop protesting or I don't like your sign. But when they say I need you to keep the volume down, which is pretty much the definition of a content neutral time, place and manner restrictions and keep your voice down is content neutral, time, place and manner. And you say no, as in I do not intend to keep my voice down. I'm not sure that's what it meant. Really? Because I've watched the video and it seems pretty clear that it means to me. Well, the circuit court judge said on the record that that's he wasn't sure what no meant. But it was in response to him. I understand. Let's assume it was no, it was in response to him saying, I need you to keep it down. And he wasn't just speaking to her. He was speaking to the group that was sitting out there. And she, you said a normal voice, but she and I'm not great at estimating, but she wasn't right in front of him. She yelled out, no, she didn't yell out. No, she said, well, you would agree that they were not face to face. Probably not as close as you and I. Farther, much farther away than us. She said it loud enough where he could hear it. So his question was whether that was in her normal voice. I don't, I don't think even Officer Devine or counsel today will say that she yelled it. And that's on the video. I mean, it's, it's in a normal tone of voice. It's less, less loud than I'm speaking now. But it was asked to, so it was asked to, in response to his statement to hold it down. Yes. Okay. Let's assume that we take the leap that the court is taking in it and that what she intended by that statement is, no, I'm not going to keep my voice down. Let's assume that's what she meant. I don't think that's demonstrated by the record, but let's assume that it is. What the EANS case said is that before you get probable cause to arrest based on the volume of speech, you have to have a warning, which I don't have a problem with what he did in terms of a warning. Keeping your voice down is kind of the definition of a warning. Absolutely. And I don't, I'm not arguing that that was anything improper about that. But what I'm saying is before the officer gets to probable cause, under the EANS decision, there has to be not just a statement, no, but something that violates the volume that is too loud after, you have to actually disobey the order. She never disobeyed the order. The statement is, I intend to disobey any order in the future. I don't believe that's what she meant. But the question is what a reasonable, I mean, certainly, certainly, gosh, by the time we get to qualified immunity, the question is not what she meant. The question is what an objectively reasonable officer could have thought she meant. Well, let's assume, let's assume that that's the case. And the officer assumed that she intends to not keep her voice down. The question then becomes, does she, does he have the right at that moment, does he have probable cause to arrest her or to order her to leave the building? What he has the right to do at that moment is to say, leave the building. And if it's a lawful order to leave the building and she disregards the lawful order to leave the building, then he can arrest her because now she is in a place that she's not allowed to be and she's refused to leave. But, Your Honor, respectfully, the order to get out of the building, without a violation, you can say, I could say I intend to murder my neighbor. Uh-huh. But I don't actually murder my neighbor. It's just, you know, you're not going to arrest me for murder, right? Because I, right. That analogy doesn't work at all. I guess what I'll say is if, if I were to, if Judge Wilkinson were to say, let's say what you were to inadvertently violate some rule of how you're supposed to behave in this room at this time. And Judge Wilkinson were to say, you violated the rules, don't violate it again. And you said, no, I assure you that what we would do is we would call someone in here and say, if you've just said you're not going to follow the rules, we would ask the person sitting at the desk to escort you out of this room. Okay. And then if you refuse to leave the room, we would escalate the situation one step further and you would be escorted out of this room, whether you wanted to be or not. I guess I just don't see how that's different from the situation. At least, or how, if an objectively reasonable officer could have interpreted her no as a statement, I don't intend to keep my voice down. I don't see why everything that happens after that is not constitutionally permissible. Well, the answer is Eanes v. State, where the Supreme Court of Maryland said that he admits he's arresting on the basis of volume. And anticipate, can an officer arrest you on the basis of the volume of your voice because he thinks? She wasn't arrested for the volume. That's what he says. Because she disregarded the order to leave. That's not what he says. It ultimately for Fourth Amendment purposes. Okay. A patient officer, he didn't just ask her to leave one time, he asked her to leave four times, at least multiple times. We might disagree whether it was three or four, but the officer showed some patience here. And as I say, one of the things that concerns me is that school boards are really under fire these days. And if we reverse, we would be putting our imprimatur on disruptive behavior in school board meetings. And there's a good bit of that already. But it's going to get to a point where people are not going to want to serve on these boards if it becomes too disagreeable. And what you have here is you have a patient officer, content neutral, making repeated requests. Repeated requests were rebuffed. And finally, he was forced to the point of taking action. And he's trying to draw a line, as far as I read the record, between allowing protests and avoiding disruption. And that's a tough line to draw in these kinds of situations. And as Judge Hurson indicated below, it's the very kind of judgment call for which qualified immunity was intended. And I think the implications of a reversal would be pretty unfortunate for the orderly conduct of school board meetings. Accepted. Let's move on to the use of unreasonable force. Because that, I don't think, has anything to do with the school board or issues like that. Well, I guess the problem you have is if the officer had probable cause on excessive force, you're going to have an issue on gram, step three. No, step three on gram is just whether the person's resisting. I mean, you can have... But she acknowledged that she was resisting. That's going to be the problem you have with qualified immunity. Well, may I? There's two instances of excessive force, one at the courthouse, one during the arrest. Let's go to the courthouse one for a second. She's under the 14th Amendment, and as was alleged in the complaint, she was not required to wear a mask in the courthouse. There was other people in the courthouse without a mask. The court viewed a videotape that is not conclusive and said that the officer acted reasonably in requiring, A, requiring her to wear a mask and throwing her to the floor. Now, he says, the court says, she sat down on the floor. I hope you've looked at the video. That's not the case. Thank you, counsel. Let me just see if my colleagues have some questions. No, we don't. Mr. Villara. Yes, thank you. May it please the court. The district court's judgment should be confirmed, affirmed, I'm sorry, for three reasons. First, Officer Devine had probable cause or reasonable belief that he had probable cause to arrest Ms. Summers. Second, the force he used was objectively reasonable. He did not throw her. Does it make any difference that the convictions were later reversed? It does. I'm sorry. It does not. Does the fact that the convictions were later reversed make a difference? It does not. Under assumption, a reversed conviction does. Your view is that the convictions itself are presumptive within the range of objectively reasonable behavior. Correct. The convictions are presumptive of probable cause, even with the reversal on appeal, unless there's fraud or perjury. Let me preface this by saying I have no idea if this actually affects the outcome in this case for a variety of other reasons. But that's a weird rule, A. And B, a federal court isn't bound by, unless you can explain to me why we would be, a federal court isn't bound by the terms of a state law defense under 1983, are we? No, but no. So, like, I don't think Maryland can decide for themselves that the fact that the court of first instance found probable cause means there's probable cause as a matter of law, irrespective of what a circuit court later says. But that's not binding in federal litigation, is it? Well, I don't think it should be disturbed because it's the court of first impression that is making determination that there is indeed probable cause for the arrest, not necessarily beyond a reasonable doubt, but there's probable cause. What I guess I'm just saying is my sense from the briefs is that Maryland state tort law says, if it's the court, is it the general district court in Maryland? I can't believe it. No, that was, the initial conviction was in the district court. It was appealed to the Maryland circuit court. So, let me say, my understanding is for Maryland tort law purposes, the district court's initial conclusion that there's probable cause is preclusive as to that issue in any future litigation, irrespective of what happens in the circuit court. Is that a correct statement? That is correct.  But there's a separate question about whether that rule applies in federal court in litigation brought under section 1983. And I don't see why it would, because the rules in federal court under section 1983 are not determined by the contours of Maryland tort law. They're determined by the sort of federal rules of section 1983, right? Let me correct one thing I said. It's presumptively. Presumptively, but all of that stuff. Right, yeah, I just wanted to clarify that. But there is, it's Heck v. Humphrey, which is a Supreme Court case, which the court considered what are the parameters for being able to bring a 1983 claim? Perhaps the answer is it's a federal question, but the federal question could be informed by what happened in state court. It's not, the state court, I think my colleague is exactly right. The state court can't be preclusive of the federal question and the probable cause. But it is just part of the, it's part of the body of evidence that could inform a conclusion of probable cause under 1983. It's a piece of evidence rather than a legal conclusion, I suppose. Okay, I do believe, though, Heck v. Humphrey says a 1983 claim requires that the underlying criminal conviction that you're challenging be set aside in some manner. Yes, but Heck v. Humphrey says that as a matter of federal law. Right, yes, okay, I don't mean to quibble on that, I'm sorry. So the second reason was that his use of force was objectionably reasonable. He didn't throw her to the ground. The video is pretty clear that she went to the ground on her own. And even if he had, if he had, that's the, because your colleague on the other side said there are arguably two instances of a seizure for the Fourth Amendment. There's what happens at the school board meeting and then there's what happens at the courthouse. And when you say he didn't throw her to the ground, you mean he didn't throw her to the ground at the courthouse. I'm just trying to make sure what part of the answer. I don't think he threw her to the ground either time. To me, throwing conveys some sort of real force to the ground. He may have taken her to the ground, but that's not unconstitutional. He had a probable cause for arrest. She resisted arrest by refusing to stand up. And he took her to the ground. If he took her to the ground, he could take her to the ground. It was legal. But if she took herself to the ground, he could stand her back up, right? Like, if he could have, but at that point. Right, that's what I'm saying. Yes, he could, right, correct. And they eventually did stand her back up at the school board meeting after they had to cuff her, hand cuff her. And then, so I guess really just two reasons. So in this case, the probable cause was evident from her actions at the school board meeting first, where she arrived without a mask. She presented an eight-month-old note indicating that she said she couldn't wear a mask. She challenged the enforcement of the policy as so dangerous, asked if he wore a mask at home, told him what every mass protester has used. It's a mandate, not a law. And she admitted that it was, she wore a mask when it was logical to do so. And so her behavior put him on notice that she was there to disrupt. She's not being arrested for those reasons, because as opposing counsel said, 40 minutes went by before he approached her again. And he only approached her after the noise from the lobby disturbed the meeting. And that's, we know that because Officer Devine testified to it. Mr. Rauch from the school board testified to it. And the video shows that several members of the panel in the back of the room, to Officer Devine's left, looked at him several times, showing that they were obviously disturbed. And that was his- This is one of those cases where it's a little bit treacherous to apply too much 20-20 hindsight. The officer was confronting, confronted with a situation that was unfolding rapidly in real time. And we can chew the bone months afterwards. But the officer had to make a judgment call in a matter of minutes. And it's really a difficult task. I don't envy officers because they're required to protect protests on the one hand. And then they're required to maintain order. And they're required to sort of strike a balance between those two under very difficult circumstances. And, but, you know, we can, we can ruminate. But the very time devoted to oral argument in an appellate court, in most cases, exceeds by many multiples the time that the officer had to make a decision. We could spend an hour, 40 minutes talking about this. But most officers don't have that kind of time. And so it seems to be what the Supreme Court is saying. You know, somebody really runs off the rails. Courts have absolutely got to draw that person to account. But this officer didn't run off the rails. He was a patient person. He was just going about trying to do his job. Oh, I agree. And that's what you, you quoted Judge Hurston. He said, hey, this is the very type of case quality immunity exists for. We have an officer who has demonstrated his patience repeatedly. He was patient when she first arrived. The testimony is that the noise grew out in the lobby. But they waited with the hope that the folks in the lobby would quiet down. There's no discussion of any of the content. They couldn't make out the content. They heard laughing and loud voices. And so after 40 minutes, it was roughly 40 minutes into the meeting, that after a few looks from the school board, that's when Officer Devine goes out and confronts the crowd. It doesn't say, hey, stop talking about whatever you're talking about. He says simply, quiet down. So he was extraordinarily patient. He tells her to quiet down. She says no. He gives her four or five orders to leave the lobby before he placed her under arrest. So this is exactly the type. He's trying to maintain order in the lobby because it's disrupting the school board behind closed doors. I understand that. I think you've both written good briefs here. And it might be most productive at this point to ask my colleagues if they have particular questions for you. I do have one, actually. Judge Benjamin, no? No, I don't have any. So does it matter? I guess what I'm trying to figure out doctrinally, does it matter if there was in fact being excessive noise? Like your friend on the other side basically says, like, as a factual matter, there wasn't excessive noise. And it's not clear you could hear it in the room. But then the question I guess I had is whether that matters at all. Because it seems to me that the officer probably could have said, like, whether or not they were in fact being too loud. It does in fact seem like the officer can say, everyone needs to keep their voice down. I don't see anything unlawful about the officer saying, this is a public meeting. I need everyone to keep their voice down. Like, I actually, I don't think we do it here. But like in the Supreme Court of the United States, the marshal says, silence is commanded while the court is in session, right? There's nothing wrong with saying, everyone needs to be quiet in certain settings, regardless of whether they've been loud before, right? Right. And once she says no, and once the officer reasonably interprets that as, I do not intend to be quiet, he can order her to leave. So I guess, could you just elaborate on what, if anything, do you view the significance of whether there was in fact excessive noise at the time the officer had ordered her to keep her voice down? I think the significance is whether or not Officer Devine interpreted the noise reasonably as excessive. And his, what happened during, while he was there, he was the one that received the looks from the panel, which told him, hey, I'm disturbed by what's going out on there. And he had looks from several members of the panel. He interpreted the noise he heard combined with the looks from the panel to say, the noise is disrupting this meeting for me. Let me try it another way. Imagine that that's all totally wrong. Would it matter? I think as long as, under qualified immunity, I'm not sure if I'm answering your question, I apologize. But I think, under qualified immunity, if he reasonably believed the noise was too loud, that's all that matters. So, I'm sorry. You okay? Yes, ma'am. Judge? Yes. We simply ask that you affirm the ruling. Thank you, sir. Thank you. Mr. Shepard. Thank you, Judge. I want to go to the courthouse use of force. I understand where the court, I try to listen during these arguments so I can tell what the judges are thinking. And I hear you loud and clear. But at the courthouse, she was not required to wear a mask, period. The court took judicial notice of the fact that unvaccinated people were required to wear a mask in that courthouse, true or false? Yes, but there was no evidence in the record as to whether she was vaccinated or not. We made the representation. I thought that the court was required to take all facts alleged to the complaint as true for purposes of summary judgment. Well, no, that's not true. You don't have to take all facts alleged in the complaint as true. You have to at 12 v. 6, but you don't at summary judgment. At summary judgment, the party opposing summary judgment has to produce evidence that would allow a fact finder to find something. Right, but there was no evidence you're hearing. But my point is, we allege... Did you submit a declaration saying that your client was vaccinated? No. So then based on the record before the district court, your client was required to wear a mask inside the courthouse absent evidence from you that she met the criteria for not wearing a mask inside the courthouse. Okay, I hear you. So let's assume that she was. I don't know. But I don't think you can get there... You know, I thought you draw reasonable inferences from the facts in the light most favorable to my client. Absolutely. I don't believe that happened in this case, Judge. But I guess what you're saying, I mean, you know, my opponent says, well, and the court says she sat down. That video doesn't show that. Okay, why did he put her on? And then you asked the question about at the arrest, well, is she allowed to get up? Well, she asked that question at the courthouse. Can I get up? The officer said, no. Made her stay on the floor for seven minutes. How is that? I don't think that's... I think that's a jury question. I don't see how... I understand all of you may think that that was totally reasonable. I'm not going to debate that. I'm not here to debate that. What I'm simply trying to say is that's not... It wasn't so clear cut that it should have been decided as a matter of law. But that's the point. It is rather clear cut. What is clear cut is whether it was objectively reasonable. Not, it doesn't... You know, you can say, was the officer right or wrong? Or should he have done this? Should he have done that? But there can be disputes. But the question ultimately, was it objectively within the realm of reason? And if it was, the Supreme Court says, the immunity should be applied earlier in the litigation rather than later. Because if you, in these sorts of situations, if you go before a jury and have to litigate it through, the value of the immunity has already been lost. And you just come back to what the officer did. In its totality, was it objectively reasonable? And to hold that there was a question about this, as I mentioned on a global level, these school boards are under fire. And they make very questionable decisions, in my view, that upset a lot of parents. And I'm sympathetic to parents that really get upset with school boards and what they're doing. But the school boards have a right to do, they're elected officials or appointed officials. They have a right to discharge their duties with just a modicum of order and peace. And that's what's at stake in a case like this. Well, not at the courthouse, Judge. But respectfully, I'd like to get back to one point. I know I already get the sense you guys are going to rule against me. But I want to make one point before I leave the podium, if I may. Going back to the arrest and the order to leave the building, the only basis was the word no. And in my humble opinion, that runs to say that the officer had the right to tell her to leave the building based on the word no, even if she meant, I may raise my voice in the future. I think that's a problem to say that he then, that that's a lawful order to leave the building, Judge Hytens, under Eames v. State. You can't read this record without thinking this individual came to that meeting determined by whatever means to do away with this mask policy. I couldn't disagree. And what, and if it created an incident, so much the better. Because an incident would generate publicity and it would magnify the message. And the, so the thought crossed my mind that this individual arrived at the meeting with the idea of creating an incident in mind. And, you know, that's not, that's not good. You can, you can want to create the incident. But there are consequences that come with creating the incident. And one of those is that you have to leave to allow the school board to discharge its democratic responsibilities in an atmosphere of some order in peace. And take a sign and protest the mask policy, write a letter to the editor, ask to appear before the school, before the school board, ask for a few minutes to talk about the mask policy, write the school board members, see if you can request a chance to talk with them, work against their re-election. All of these things in a democratic society one can do. But what one cannot do is what she did. That's just speaking for myself. I understood, Judge. May I make one last comment and I'll sit down? I know I'm out of time. No, I'd like to know, what was the thing that you attempted to say you disagreed with something? I'd like to know. Well, I disagree with the premise of the findings that the court is making with respect to my client's intentions. And that I don't see this case in that light at all. But I understand what Judge Wilkinson is saying. That the school board has a right to conduct business, just like this court does. And I totally understand the desire for order. No objection to that. The United States Supreme Court in Hill said that the right of a citizen to protest or disagree with a police officer peacefully and not risk arrest or punishment thereby is the difference between a free nation and a police state. Her saying no, regardless of what you guys are saying, is that because she said no, and a reasonable officer could interpret that as she might get loud again, assuming that she was, which is not conceded, that that gives him probable cause to say you can leave. I'm saying that's incorrect. It's a matter of law. Police states don't request feasible actions or different forms. They come and drag people off without any explanation. They don't make the request that this officer did. You can tell me you think that everything I've said has been wrong. I'm not going to do that, Judge. I respect you too much. And I always tell litigants how much I appreciate their passion about their case. And I say, if you're mad with me, you don't even have to shake hands with me. Oh, I would never do that. I would never act that way, Your Honor. Thank you. OK. We thank you. Appreciate your arguments. And we will adjourn court and come down and read counsel. This honorable court stands adjourned, sign and die. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Toby J. Heytens, DeAndrea Gist Benjamin